**E-Filed 1/20/2010**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| DALIT WAISSMAN, | Case Number C 08-04731 JF (PVT) |
| Plaintiff, | |
| v. | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| LIFE INSURANCE COMPANY OF NORTH AMERICA, SAP AMERICA, INC., LONG TERM DISABILITY INCOME PLAN, and SAP AMERICA, INC. LIFE INSURANCE PLAN, | |
| Defendants. | |

Plaintiff Dalit Waissman ("Plaintiff") brings this action pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), against Life Insurance Company of North America ("LINA"), SAP America, Inc. Long Term Disability Income Plan, and SAP America, Inc. Life Insurance Plan (collectively, "Defendants"). She alleges that she improperly was denied long-term disability benefits, and she seeks a waiver of premium benefit with respect to her life insurance. Having considered the administrative record and the parties' written submissions, as well as the oral argument presented by counsel at a bench trial on December 4, 2009, the Court now sets forth its Findings of Fact and Conclusions of Law.

1       **I. Findings of Fact[1]**

2       **A. Plaintiff's Personal and Professional Background**

3    1.     Plaintiff is a fifty-three year old woman who was born in Israel and served as a Lieutenant

4           in the Israeli Air Force before immigrating to the United States in 1984.  She holds a

5           Bachelor of Science degree with distinction in computer science from Simmons College

6           in Boston, Massachusetts.  Prior to her employment by SAP, Inc., Plaintiff worked as a

7           computer programmer and as an educational consultant and resource coach at Digital

8           Equipment Corporation.  AR 1248-1249.

9    2.     Plaintiff then transitioned into technical training and documentation work.  AR 1248.

10          From 1995 to 1997, Plaintiff performed the job of a technical writer from her own home

11          as an independent consultant.  AR 895.

12   3.     Plaintiff began working as a Senior Technical Writer at SAP, Inc. ("SAP") in 1997.  AR

13          1248.

14      **B. Occupational Requirements of Plaintiff's Position with SAP**

15   4.     According to SAP, the qualifications of a Technical Writer I and II and Senior Technical

16          Writer include "excellent research, interviewing and writing skills; information mapping

17          skills; instructional design skills; knowledge of the business cycles; knowledge of

18          computer software, Windows applications and authoring tools; and HTML/Internet

19          knowledge."  AR 1283.

20   5.     SAP describes the essential duties of Technical Writer I and II and Senior Technical

21          Writer as the following: "researches, outlines, and writes documentation that is

22          technically accurate and follows the company's writing style; coordinates and plans

23          information products and new functional descriptions with Integrated Solution Team,

24          Development, Translation, and Marketing; ensures quality assurance by critiquing and

25          editing colleagues' work; coordinates activities with outside vendors and gathers

26          feedback on products from customers, and SAP employees; and manages documentation

27

28      [1]All facts cited herein are taken from the administrative record ("AR") unless otherwise
        noted.

library and Intranet delivery mechanisms." AR 1282.

6. Plaintiff's job as a Senior Technical Writer required an ability to concentrate and work over long hours to learn and write in various programming languages for different projects with periodic deadlines. AR 294.

7. While mentally demanding, Plaintiff's job was a sedentary occupation described by SAP as 99% sitting and 1% walking. AR 1281.

**C. Plaintiff's Medical History and Proof of Disability Prior to Approval of Disability Benefits**

8. Plaintiff originally was diagnosed with interstitial cystitis ("IC") in 1987. IC is an autoimmune disease that causes deterioration in the lining of the bladder. Ulcers or hemorrhages in the lining of the bladder allow urine to contact underlying tissue and nerves, causing severe pain and the need to urinate very frequently. AR 294-95. On April 9, 2004, Dr. Christopher Payne, a urologist at Stanford University Medical Center, wrote in a letter to Plaintiff's primary care physician that Plaintiff's IC was "relatively severe" and that she had "very small bladder capacity." AR 227.

9. Plaintiff underwent surgery for acute appendicitis on September 24, 1999. Following the surgery, she experienced tingling in her feet, painful walking, intermittent paresthesias of her entire legs, areas of numbness in her abdomen, and other neurologic symptoms. AR 943. These symptoms precipitated a diagnosis of transverse myelitis, and Plaintiff was admitted to the hospital on October 13, 1999 for intravenous medication. AR 943-46. At that time, an MRI of Plaintiff's spine revealed that there was an area of demyelination at the T4 and T5 level. Plaintiff's cerebrospinal fluid had positive oligoclonal bands and elevated IgG index. AR 943-46.

10. In March 2000, Plaintiff suffered from an episode of Bell's palsy on the left side of her face and began to experience head pain, vertigo and extreme fatigue. AR 295, 1090.

11. On May 19, 2000, Plaintiff's treating neurologist, Dr. Christopher Lock, concluded that an MRI showing approximately four areas of T2 hyperintensity; evidence of transverse myelitis in October; an occurrence of Bell's palsy in March; increased IgG; and positive

3

oligoclonal bands were consistent with a diagnosis of multiple sclerosis ("MS").  AR 985-86.

12.   On July 3, 2000, Dr. Stephen Hauser, a neurologist and expert on MS, confirmed Plaintiff's MS diagnosis. AR 225-26.

13.   The record establishes that Plaintiff suffers from MS.

14.   Plaintiff's last active day of work was June 12, 2000.  Her annual salary at that time was approximately $109,000. AR 294, 1165.

**D. History of Disability Benefits**

15.   At all relevant times, Plaintiff was insured by the SAP America, Inc. Long Term Disability Income Plan ("Disability Plan") and the SAP America, Inc. Life Insurance Plan ("Life Insurance Plan").

16.   The Disability Plan defines "Total Disability" as follows:

> Total Disability. An Employee will be considered Totally Disabled if, because of Injury or Sickness, he is unable to perform all the essential duties of his occupation.  An employee will not be considered Totally Disabled if, during any period of time: (1) his earnings exceed 80% of his indexed Prior Monthly Earnings; or (2) Monthly Benefits are payable for Residual Disability. AR 1294.

17.   The Disability Plan defines the term "sickness" as "a physical or mental illness. It also includes pregnancy." AR 1291.  The Disability Plan does not define "all the essential duties of his occupation."

18.   The Life Insurance Plan contains a waiver of premium benefit.  The relevant terms read, "If an Employee becomes Totally Disabled before age 60, the premiums for his Basic Life Insurance will be waived while he remains continuously Totally Disabled."  AR 117.  The plan explains that "[a]n Employee will be considered Totally Disabled if, because of Injury or Sickness, he is unable to perform all the essential duties of any occupation for which he is or may reasonably become qualified based on his education, training, or experience." AR 107.

19.   Plaintiff submitted her initial disability claim on December 14, 2000.  The claim was received by Defendants on December 20, 2000.  Plaintiff's description of her disability reads, "experiencing neurological pain and burning sensation in the head on a

4

daily/nightly basis, accompanied by an extreme chronic fatigue.  These symptoms started around April/May 2000 and then became stronger and debilitating in May/June. Following a history of Transverse Myelitis and Bell's Palsy earlier this year and in order to find the cause of my current symptoms an MRI was done 5/14/2000 and I was diagnosed with Multiple Sclerosis." AR 1163.

20. Dr. Lock completed the Attending Physician's Statement for Plaintiff's initial disability claim.  He described Plaintiff's symptoms as "fatigue, pain and burning sensations in head; altered sensation in back/intermittent pins and needles in feet," and remarked that "patient [is] disabled primarily by fatigue; abnormal sensations in head, burning/pain, sometimes associated with mild nausea/dizziness."  AR 1184-85.

21. On December 28, 2000, during her initial telephone contact with the Plan Administrator concerning her claim, Plaintiff informed the Plan Administrator that she also suffered from IC and depression.  AR 1276.

22. Plaintiff asserts that prior to the onset of her MS, the pain and frequent need to urinate caused by her IC made it difficult for her to work, but that she continued to work because she valued her career.  However, after the onset of her MS, Plaintiff's IC became a complicating factor because the need for frequent urination interrupted her sleep, exacerbating her fatigue. AR 294-95.

23. On February 19, 2001, Dr. Dennis Facchino, who then was Plaintiff's treating psychotherapist, explained in response to an inquiry from LINA that Plaintiff suffers from "overall depression, fatigue, anxiety and the inability to concentrate [and] focus on tasks for a significant length of time. " AR 1197.

24. On January 21, 2000, Plaintiff requested that LINA not release medical information to her employer without first obtaining her consent.  She indicated that only one person at work knew of her medical condition and she did not wish to jeopardize her future employment if she were to recover and be able to work again in the future.  AR 1236.

25. The record as a whole establishes that Plaintiff's request to keep her medical information confidential in the hope that she might return to work supports a finding that Plaintiff's

5

1    continuous reports of pain, fatigue, and inability to concentrate are credible.

2    26.    Plaintiff sought continuous treatment with Dr. Lock following her diagnosis of MS on

3           May 19, 2000.  Dr. Lock's notes consistently reflect Plaintiff's complaints of head pain

4           and fatigue. AR 1061, 1064, 1080, 1085.  Specifically, Dr. Lock noted on March 20,

5           2001, that at times, the burning and pain in Plaintiff's head were "unbearable" and

6           "caus[ed] her significant distress.  She says that she also feels fatigued." AR 1060.  Dr.

7           Lock also wrote, "while her neurological exam is relatively normal.  I understand that she

8           is having significant head pain...I said that this is likely related to her MS.  It is difficult to

9           incriminate a particular lesion but it is likely that the pain pathways have been disturbed

10          by the inflammatory process." AR 1061.

11   27.    On March 22, 2001 LINA approved Plaintiff's claim for long-term disability benefits and

12          her claim for the waiver of premium benefit under her group life insurance coverage. AR

13          1170-71.  LINA's claim file diary note approving the claims stated:

14              Claim was discussed in case management session with MC, senior case manager
                & other case managers.  It was discussed that a TSS would not be of any value as
15              claimants problems with MS are cognitive & this could not be measured
                physically.  Suggested to learn if cognitive testing was performed.  Based on
16              claimants very technical background & her inability to concentrate, MRI results
                showing deep white matter claimant would be considered disabled.  Her claim for
17              premium waiver will also be approved.

18              LINA 0067.

19   28.    On April 24, 2001, the Social Security Administration ("SSA") determined that Plaintiff

20          is disabled. AR 928-31.  The determination was made on Plaintiff's initial application.

21          On April 22, 2005, the SSA determined that Plaintiff's disability was continuing.  AR

22          244-46.

23          **E. Plaintiff's Health between the Approval of Her Claim and the Subsequent
            Termination of Her Benefits**
24
25   29.    Plaintiff continued to seek treatment from Dr. Lock until his departure from the Palo Alto

26          Medical Foundation ("PAMF") in April 2006.  Over this period of time, Plaintiff visited

27          Dr. Lock frequently, and his notes document that Plaintiff suffered from consistent head

28          pain and fatigue.  LINA 277, 372, 570, 758-59, 820-21, 838, 860-71.

6

30.   In January 2006, at Defendants' request, Dr. Kenneth B. Graulich reviewed Plaintiff's medical records.  He acknowledged that Plaintiff had been diagnosed with MS, but he concluded that Plaintiff's headaches were of unknown etiology and that he was unable to relate them directly to MS.  He also noted that Plaintiff's IC and depression were beyond his expertise and that he would defer consideration of those conditions to an appropriate specialist.  AR 533.

31.   Defendants do not dispute that Plaintiff suffers from IC or Plaintiff's account of her symptoms.

32.   Defendants arranged an Independent Medical Examination of Plaintiff by Dr. Subroto Kundu.  Dr. Kundu is affiliated with MLS National Medical Evaluation Services.  AR 467.

33.   Dr. Kundu performed a thirty-minute clinical examination of Plaintiff and concluded that while Plaintiff's MS diagnosis was "probable," MS is a "painless disease."  AR 473.  Dr. Kundu also attributed Plaintiff's fatigue to chronic fatigue syndrome rather than MS.  He opined that Plaintiff "should be able to perform her regular sedentary occupation, as the physical needs of her employment are not significantly different from the level of performance manifested during the course of th[e] examination." AR 493.

34.   Surveillance of Plaintiff between April 17 and April 19, 2006 revealed that Plaintiff left her property only once to go to the Independent Medical Examination scheduled by Defendants.  The surveillance revealed no evidence of sustained activity that contradicts Plaintiff's claimed disability.  AR 413-425.

35.   Based upon the recommendations and conclusions of Dr. Graulich and Dr. Kundu, as well as their surveillance of Plaintiff, Defendants terminated Plaintiff's disability benefits on May 25, 2006.  AR 401-406.

36.   Defendants' termination letter reflects the fact that the Independent Medical Examination report was shared with Plaintiff's primary care physician, Dr. Susan Elgee, and with Dr. Lock.  Dr. Elgee provided no comment and deferred to Plaintiff's neurologist.  While Dr. Lock did not comment either, AR 405, it is undisputed that Dr. Lock had stopped

7

1   practicing at PAMF in April 2006.  AR 298-99.  Plaintiff continues to be a patient at

2   PAMF.

3   37.   Dr. Gershfield replaced Dr. Lock as Plaintiff's treating neurologist when Dr. Lock left

4         PAMF.  On May 23, 2006, the same day that Defendants issued their termination letter,

5         Plaintiff had her first appointment with Dr. Gershfield. AR 255.

6   38.   Dr. Gershfield's notes from Plaintiff's first appointment are consistent with Dr. Lock's

7         reports of head pain and fatigue.  AR 255.

8   39.   Upon receiving the termination letter, Plaintiff requested that Dr. Gershfield write a letter

9         in support of her claim for continued disability benefits.  Dr. Gershfield sent such a letter

10        to Defendants on June 29, 2006, stating that Plaintiff "has disabling fatigue and pain in

11        association with her multiple sclerosis; in addition, she suffers from interstitial cystitis

12        and depression" and that '[s]he continues to be disabled from symptoms related to her

13        multiple sclerosis."  AR 254.

14  40.   Dr. Gershfield wrote another letter in support of Plaintiff after reviewing the denial of

15        Plaintiff's claim.  Dr. Gershfield asserted that Plaintiff's diagnosis of MS "is secure" and

16        that it "is based on her clinical presentation as well as the result of objective laboratory

17        and neuroimaging studies."  AR 223.  The letter states that Plaintiff has "encountered

18        tremendous difficulty due to pain and fatigue, and these problems have limited her

19        significantly and restricted her ability to participate in work and social activities."  AR

20        223.

21  41.   Dr. Gershfield also contended that Dr. Kundu's statement that MS is a painless disease is

22        unsupported in his report, false, and contradicted in "basic textbooks in the field."  AR

23        223.  Dr. Gershfield cited page 316 of *McAlpine's Multiple Sclerosis,* which he considers

24        a standard textbook on MS.  The relevant text reads, "Pain is frequently listed amongst

25        the initial symptoms of multiple sclerosis or as occurring in the course of the disease."

26        AR 223-24.

27  42.   Beyond Dr. Kundu's bare statement, there is no evidence in the record supporting Dr.

28        Kundu's position that MS "is a painless disease."

1    43.   In his November 2006 letter, Dr. Gershfield also opined that Plaintiff's "debilitating

2          fatigue" is a "disabling symptom...highly characteristic of Multiple Sclerosis." AR 224.

3          He cited page 643 of *McAlpine's Multiple Sclerosis*, which states that "[a]n excessive

4          sense of fatigue affects the great majority of patients with Multiple Sclerosis and up to

5          40% claim this to be their dominant complaint." *Id.* Dr. Gershfield explained that MS

6          fatigue is not just "tiredness after exertion, but also of asthenia, or fatigue at rest; this

7          aspect of fatigue can be the cause of limitation of the ability to perform sedentary work."

8          *Id.* Finally, Dr. Gershfield expressed "surprise[]" that Dr. Kundu raised chronic fatigue

9          syndrome in addressing Plaintiff's fatigue given that "discussions of fatigue as a symptom

10         in multiple sclerosis are easily found in basic textbooks on the subject." *Id.*

11   44.   Based upon the entire record, the findings and conclusions of Dr. Lock and Dr. Gershfield

12         are more convincing than those of Dr. Graulich and Dr. Kundu.

13   45.   Dr. Graulich never had personal contact with Plaintiff or with her treating neurologists.

14         His evaluation of Plaintiff was restricted to his review of Plaintiff's medical records as

15         they existed prior to 2006. Moreover, he concedes that he did not consider the interplay

16         between Plaintiff's IC and her MS.

17   46.   Dr. Kundu's conclusion that MS is a painless disease is contradicted directly by Dr.

18         Gershfield, as well as by a standard textbook on MS. Defendants do not challenge the

19         authenticity of the quotations from the textbook or the textbook's general acceptance in

20         the field.

21   47.   Dr. Kundu's conclusion that Plaintiff should be able to perform her occupation as a

22         technical writer because it is sedentary and involves physical demands similar to those of

23         her medical evaluation similarly is unpersuasive. Plaintiff does not dispute the sedentary

24         nature of her occupation, but she asserts that her head pain, fatigue, and difficulty

25         concentrating make her unable to meet the cognitive demands of being a technical writer,

26         as defined by both SAP and the Directory of Occupational Titles ("DOT").

27   48.   The medical opinions of Plaintiff's treating neurologists, Dr. Lock and Dr. Gershfield,

28         appear to be free of the incentives attached to medical evaluation performed and

1  compensated for the purpose of litigation. *Black & Decker Disability Plan v. Nord*, 538

2  U.S. 822, 832 (2003) (holding "that physicians repeatedly retained by benefits plans may

3  have an 'incentive to make a finding of 'not disabled' in order to save their employers

4  money and preserve their own consulting arrangements'").

5  49.  Plaintiff sought a medical evaluation and neuropsychological report from Dr. Shiela

6  Bastien on January 15, 2007.  Plaintiff was referred to Dr. Bastien by her counsel.  AR

7  173.  Dr. Bastien performed multiple cognitive tests, such as the WAIS-III, and the results

8  from these tests are the only such evidence in the record.  The test results include, but are

9  not limited to the following findings:

(1) "Tests that measure sequential reasoning are problematic.  In addition, her
speed of processing is severely compromised...she has sequential reasoning
problems as well as significant problems with memory.  Her short-term memory
and concentration is very poor. She has a loss in remote memory;" (2) "on story
learning, initial verbal learning was above average.  After a four-hour delay, she
was in the severe range of impairment.  With this level of impairment she could
not work in any job in the national economy.  After fo[u]r hours, information is
gone, and it may be gone even before four hours; (3) "On the Differential
Aptitude Test, her scores are too low for her to perform her previous job.  Or in
fact, any job in the national economy for which she has reasonable training and
experience.  She is too low in numerical ability at the 40th percentile.  She needs
to be between the 80th and 90th percentile.  Her abstract reasoning is at the 35th
percentile, it needs to be between the 80th and 90th percentile.  Spatial relations
need to be between the 80th and 90th percentile, she is at the 60th percentile.
Even more problematic is her Clerical Speed and Accuracy, which is so low that
she could not function in any job that requires paperwork or detail.  She could not
keep the pace.  Clerical speed and accuracy should be at the 80th to 90th
percentile, she is at the 25th percentile." AR 193-200.

20  50.  Occupational requirements for a Writer of Technical Publications as defined by the DOT

21  include numerical aptitude of 67-89 percentile, clerical aptitude of 67-89 percentile,

22  general learning ability of 67-89 percentile, and verbal aptitude above the 89 percentile.

23  AR 569.

24  51.  Dr. Bastien performed Symptom Validity Tests and concluded that Plaintiff's scores were

25  normal, signifying that there was "no obvious attempt to exaggerate or distort her

26  problems." AR 201.

27  52.  The findings in Dr. Bastien's report demonstrate that Plaintiff's cognitive abilities

28  presently are below those required for a Technical Writer, as defined by the DOT.

53.   Defendants question Dr. Bastien's credibility and contend that she is a hired advocate. Defendants premise this argument on the fact that no other doctors rendered the same conclusions. While this statement is true, it also is true that no other doctor claims to have performed the same type of tests on Plaintiff. Defendants present no evidence of like testing with differing results.[2]

## II. Conclusions of Law

### A. Legal Standard

54.   ERISA provides for judicial review of a decision to deny benefits to an ERISA plan beneficiary. *See* 29 U.S.C. § 1132(a)(1)(B).

55.   The parties have stipulated that review in the instant case is de novo. Accordingly, "[t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits, without reference to whether the administrator operated under a conflict of interest." *Abatie v. Alta Health & Life Ins. Co.,* 458 F.3d 955, 963 (9th Cir. 2006).

56.   In determining whether Plaintiff is totally disabled, the court is to "evaluate the persuasiveness of conflicting testimony and decide which is more likely true." *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999) (en banc).

57.   The burdens of proof on de novo review are as follows: "Plaintiff must carry the burden to prove that she was disabled under the meaning of the plan and Defendants must carry the burden of proving the applicability of any plan coverage exclusion they seek to invoke." *Sabatino v. Liberty Life Assurance Co. of Boston*, 286 F.Supp.2d 1222, 1232 (N.D. Cal. 2003).

58.   Plaintiff concedes that a claimant generally carries the burden to prove that she is disabled under the meaning of the plan, but she disputes the application of this general rule in her case because Defendants seek to terminate her disability benefits (as distinguished from

---

[2]   Defendants point to the many mental status examinations performed by Plaintiff's treating neurologists, Dr. Lock and Dr. Gershfield, and their consistent finding that Plaintiff was "alert." However, Defendants do not define the neurological meaning of "alert" or demonstrate how a finding that Plaintiff is "alert" bears on her disabling cognitive ability, pain, or fatigue.

refusing to award them in the first place).  Plaintiff contends that in the present

circumstances, the burden of proof shifts to the Defendants.  However, in *Muniz v. AMEC*

*Const. Management*, No. CV-07-8066 CAS (AJWx), 2009 WL 866843, *5 (C.D. Cal.

March 30, 2009), when considering the same inquiry, the court concluded that a

burden-shift is "unsupported by case law, as numerous courts, including several within

this circuit, have consistently held that the burden of proof remains with the plaintiff in

just such a case."  *Id.* at *5, citing *Clifford v. Prudential Ins. Co. of Amer.*, No.

07-CV-126-ST, 2008 WL 4164750, at *9 (D. Or. Aug. 27, 2008); *Gardner v. Bear Creek*

*Corp.*, No. C 06-02822 MHP, 2007 WL 2318969, at *13 (N. D. Cal. Aug. 6, 2007);

*Fulayter v. Prudential Ins. Co. of Amer.,* No.CV06-1435-PCT-NVW, 2007 WL 433580,

at *8 (D. Ariz. Feb. 6, 2007); *Gatti v. Reliance Standard Life Ins. Co.,* No. CV

01175-TUC-FRZ. 2006 WL 664422, at *6 (D. Ariz. Mar.13, 2006).  This Court finds

*Muniz* persuasive and concludes that Plaintiff has the burden of proof in the instant

action.

**B. Documents Considered**

59.    Plaintiff requests that the Court take judicial notice of excerpts from two medical texts:

*McAlpine's Multiple Sclerosis, 4th Edition*, pages 316-21, 327 and 643 (2005) by Alistair

Compston, et al. and *The Mental Status Examination in Neurology,* pages 7-8 (1977) by

Richard L. Straub and William F. Black.  Plaintiff contends that case authority supports

her request, citing *United States v. Murdoch*, 98 F.3d 472, 479 (9th Cir. 1996) (Concur

opn.) (taking judicial notice of the American Medical Association's ("AMA") Diagnostic

and Statistical Manual) and *Pyles v. Merits Systems Protection Bd.*, 45 F.3d 411, 415

(Fed. Cir. 1995) (taking judicial notice of a medical dictionary's definition of

"dementia").  However, the texts judicially noticed in *Murdoch and Pyles*, respectively,

are distinguishable from the medical texts at issue here in that their contents are subject to

a standard that is reliable and generally known.  The same is not true for all medical texts,

including those at issue here.  Accordingly, the Court will deny Plaintiff's requests for

judicial notice.  However, as discussed above, the Court has considered the fact that Dr.

12

1    Gershfield's report, which is a part of the administrative record, quotes from *McAlpine's*

2    *Multiple Sclerosis, 4th Edition*, and that Dr. Gershfield considers that publication to be

3    "the standard textbook" on MS.  While the Court cannot take judicial notice of the

4    assertions made in *McAlpine's Multiple Sclerosis, 4th Edition*, it obviously can consider

5    Dr. Gershfield's opinions in determining if Plaintiff has carried her burden.

6    **C. Terms of the Plan**

7    60.  On de novo review, the court interprets the plan by looking "first to the terms of the Plan

8         itself."  *Nelson v. EG & G Measurements Group, Inc.*, 37 F.3d 1384, 1389 (9th Cir.

9         1994).

10   61.  Courts must interpret policy provisions in light of the explicit language of the policy and

11        in the context of the policy as a whole.  *Richardson v. Pension Plan of Bethlehem Steel*

12        *Corp.*, 112 F.3d 982, 985 (9th Cir. 1997).  Ambiguities in the policy terms should be

13        construed against the insurer.  *Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 539-41

14        (9th Cir. 1990).  The terms of insurance policies subject to ERISA must be interpreted "in

15        an ordinary and popular sense as would a person of average intelligence and experience."

16        *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1125 (9th Cir. 2002).

17   62.  Defendants contend that the phrase "all essential duties" within the Disability Plan means

18        "every" essential duty. Def. Trial Brief at 19, citing *Ellis v. Liberty Life Assurance Co. of*

19        *Boston*, 394 F.3d 262, 270 (5th Cir. 2004) ("We interpret 'unable to perform all' as

20        synonymous with 'not able to perform every.'  In other words, 'unable' is synonymous

21        with 'not able,' and 'all' is synonymous with 'every.'") and *Saffle v. Sierra Pacific Power*

22        *Company Bargaining Unit Longer Term Disability Plan*, 85 F.3d 455, 456-59 (9th Cir.

23        1996).

24   63.  The standard of review in both *Ellis and Saffle* was for abuse of discretion, and thus the

25        holding of these cases with respect to the meaning of "all" is of limited value.  In *Teicher*

26        *v. Regence Health and Life Ins. Co.*, 562 F.Supp.2d 1128, 1135 (D. Or. 2008), the court

27        noted that the Ninth Circuit has yet to define "all" in the context of a long-term disability

28        policy.  *Teicher* also concluded that the Ninth Circuit's reasoning in *Saffle,* appear[ed] to

13

1  resemble more closely the qualitative approach" in which "all" would mean "any one, not

2  every one" of the essential duties. *Id.* at 1135-38.

3  64.   While it finds *Teicher* persuasive, this Court need not determine whether "all" means

4  every one or any one of the essential duties of Plaintiff's job, as the administrative record

5  supports a finding of disability under either construction.  Plaintiff's head pain, extreme

6  fatigue, and the cognitive limitations caused by the combined effects of MS and IC impair

7  her ability to think and concentrate for any extended period of time.  This capability

8  obviously is essential if Plaintiff is to perform her duties as a Technical Writer.

9  65.   The parties also dispute the meaning of the term "occupation" within the Disability Plan.

10  Plaintiff contends that "occupation" means Plaintiff's own position as a *Senior* Technical

11  Writer at SAP, while Defendants argue that it signifies Plaintiff's general occupation as a

12  technical writer.  There is no dispute that "occupation" within the Life Insurance Plan

13  means any occupation for which Plaintiff is or reasonably may become qualified based on

14  her education, training or experience.

15  66.   The record establishes that Plaintiff's head pain and debilitating fatigue would lead to

16  frequent absences from work, preclude her from maintaining a normal work pace, and

17  frustrate her ability to concentrate for extended periods of time.  The Court need not

18  construe the meaning of the term "occupation," as these impairments would prevent

19  Plaintiff from performing all of her essential duties under either construction.[3]

20  **D. Proof of Disability**

21  67.   The record establishes that Plaintiff suffers from MS.  As a matter of law MS satisfies the

22  Plans' definition of "sickness."

23  68.   The SSA's initial determination that Plaintiff is disabled and its subsequent conclusion

24

25  [3]  Defendants contend for the first time in their opposition papers that Plaintiff cannot be

26  found totally disabled in light of language in the Disability Plan that an employee is residually
disabled only if "he is able to return to work, but is earning less than 80% of his Basic Earnings

27  in his regular occupation."  AR 1294.  However, for the same reasons that it concludes that
Plaintiff is totally disabled, the Court also concludes that Plaintiff has demonstrated that she is

28  not able to earn eighty percent of her income in her occupation.

1  that Plaintiff continues to be disabled are not binding on the Court. *Lona v. Prudential*

2  *Ins. Co. of America*, No. 07-CV-1276-IEG (CAB), 2009 WL 801868, *14, n. 10 (S.D.

3  Cal. Mar. 24, 2009), citing *Wible v. Aetna Life Ins. Co.,* 375 F.Supp.2d 956, 971 (C.D.

4  Cal. 2005) (citations omitted).  However, the Court may and does in this instance

5  conclude that the SSA's determinations support Plaintiff's ERISA claim.  This is

6  especially true given that the SSA has determined that considering her age, education, and

7  work experience, Plaintiff could not engage in any other kind of substantial gainful work

8  in the national economy. 42 U.S.C. § 1382c(a)(3)(B).  That legal standard necessarily is

9  more difficult to satisfy than the terms of Plaintiff's Disability and Life Insurance plans.

10  69.   The Court concludes that Plaintiff is totally disabled within the meaning of her Disability

11  Plan and Life Insurance Plan, in that her chronic head pain, fatigue, and difficulty

12  concentrating prevent her from being able to engage in the mentally demanding

13  occupation of a technical writer.  The Court finds and concludes that Plaintiff's own

14  testimony as to her disabling symptoms, as supported by the opinions and reports of Dr.

15  Lock, Dr. Gershfield, and Dr. Bastien, substantially outweigh the contrary evidence

16  presented by Defendants.

17  ### III. Disposition

18  Good cause therefor appearing, IT IS HEREBY ORDERED that Plaintiff's future long

19  term disability benefits be reinstated, that she be awarded past disability benefits retroactive to

20  May 25, 2006, plus interest pursuant to 28 U.S.C. § 1961, that all other benefits under the Plan be

21  reinstated, including waiver of Plaintiff's premiums under the Life Insurance Plan.  Pursuant to

22  29 U.S.C. § 1132(g)(1), the Court will entertain a motion for an award of reasonable attorney's

23  fees and costs.  Counsel are directed to meet and confer as to the proper form of judgment and

24  the briefing schedule for the motion for an award of attorney's fees and costs.

25  IT IS SO ORDERED.

26  DATED: January 20, 2010

27  _____

28  JEREMY FOGEL
    United States District Judge

15